# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LORENZO A. THOMPSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-160-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant, Lorenzo A. Thompson ("Thompson"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Thompson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Thompson was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

Thompson was approximately 44 years old years old at the time of the hearing before the ALJ on April 14, 2010. (R. 51, 113). He had a high school education. (R. 31). Thompson's relevant past work included working as a car detailer and as a janitor. (R. 27-30). Thompson said he had to quit working as a car detailer because he was no longer able to use the car buffer. (R. 31).

In 1989, Thompson sustained a back injury in a car accident and in 2008, Thompson sustained a neck injury in a bicycle accident. (R. 30-32; *see also* R. 26). After the bicycle accident, Thompson underwent surgery on his neck and spine, but continued to experience pain in his neck and in his left arm, left leg, and left foot. (R. 31-33). Thompson said that the pain started in his neck and radiated down his left arm, and down his left leg and into his foot. (R. 30-31). He testified that he had difficulty using his hands because he did not have the strength and could not maintain a good grip. (R. 32, 44-45). Thompson testified that he writes with his right hand but does everything else with his left hand. (R. 31). On occasion, his arm and left foot would go numb. (R. 32, 37). Thompson described the pain as feeling like he was constantly being stuck with a "stick pen" in his neck and down the left side of his body. (R. 32-33).

Thompson testified that he had three to four "bad" days every week. (R. 34). Thompson said that on those days, he was unable to stay still. (R. 34). He stated he continually moved around to try to find a comfortable position. *Id.* Usually, the most comfortable position for Thompson would be to sit and lean to his right side. *Id.* He said that he tried to lessen his pain by relaxing and by taking over-the-counter pain medication. (R. 33, 39). He testified that he stopped using a heating pad because it was not helping. (R. 39). Thompson said that the weather affected the level of his pain. (R. 35). He explained that cold temperatures made his skin hurt. (R. 35).

Regarding his physical limitations, Thompson estimated that on a good day, he could sit for 30 to 60 minutes. (R. 33-34). He said that he was able to walk approximately the distance of a block before he had to stop and rest. (R. 35-36). Thompson estimated that he could stand for 30 to 60 minutes before needing to sit down. (R. 35). He said he shifted his weight to his right

leg when he stood. (R. 36). Thompson testified he could walk one block before needing to stop and rest. (R. 35-36). He estimated that he could occasionally lift 25 pounds. (R. 36-37). Thompson testified he had difficulty with sustaining activities. (R. 49).

Thompson said he spent his days primarily at home, watching television and reading. (R. 44). He sometimes was unable to sleep because of pain. (R. 40). Thompson said he sometimes had difficulty putting on his clothes and with grooming. (R. 40, 42). On occasion, Thompson had difficulty tying his shoes. (R. 46-48). He could sweep the floor by sweeping small sections at a time. (R. 41). Thompson's mother and sister did his laundry. *Id*. His son drove him to do his errands and to get groceries. (R. 42). Thompson testified that he used to frequently ride horses but was no longer able to. (R. 43). Thompson also stated he no longer participates in social activities other than attending weekly family gatherings. *Id.*

Thompson said that Dr. Min,[1] who performed his surgery, wanted Thompson to undergo another MRI scan so he could determine if further surgery would be necessary. (R. 38). Thompson testified that he was unable to afford the scan and was unable to afford another appointment. *Id*.

Records from St. John Medical Center reflect that on September 4, 2008, Thompson suffered cervical fractures and a spinal cord injury resulting from a bicycle accident. (R. 214-26). The records reflect that Thompson had alcohol, cocaine, and marijuana in his system at the time of the accident. (R. 220, 224, 230). Thompson complained of severe pain in his neck, with some burning pain and weakness in his hands. (R. 216). Neurologic examination showed that

---

[1] The transcript refers to the physician as "Dr. Mann," however, the medical records indicate the correct spelling is Dr. Min. (R. 242-47).

Thompson had motor deficit in his left upper extremity, and decreased grip strength with his left hand. (R. 220). Cervical x-rays showed that Thompson had C1 and C4 level fractures and malalignment. (R. 217, 221, 233-36). W. David Min, M.D., diagnosed Thompson with moderate-to-severe stenosis,[2] as well as a spinal cord injury at the C4 segment. (R. 224). On September 8, 2008, Dr. Min performed a cervical laminectomy of levels C3 through C6. (R. 224-26). On September 9th and 10th, Thompson's physical therapy evaluations showed that he had a left side balance deficit, and he was leaning to the left when he stood. (R. 238-41). Dr. Min discharged Thompson from the hospital on September 11, 2008 in fair condition. (R. 212-15). The discharge summary reflects that Thompson was not to lift more than 7-10 pounds and he was not to participate in strenuous activity. (R. 212, 215).

On September 30, 2008, Thompson had a follow-up visit with Dr. Min. (R. 246-47). At that time, Thompson complained of pain in his neck that radiated to both of his shoulders. (R. 246). He additionally reported that he continued to experience burning pain in his shoulders and arms. *Id*. Thompson also complained of weakness, numbness, and tingling in his left arm. *Id*. He additionally had numbness and tingling in his left leg, and muscle spasms in his back. *Id*. Thompson said that Percocet was not relieving his pain. *Id*. On examination, Dr. Min found that Thompson had weakness in his arms. *Id*. However, Dr. Min made a notation that he had difficulty assessing the degree of weakness because Thompson did not give good effort with resistance due to his pain. *Id*. Dr. Min started Thompson on the medication Lyrica as treatment for neuropathic pain. *Id*. He refilled Thompson's prescriptions for Lortab and Flexeril. *Id*.

---

[2] Spinal stenosis is an abnormal "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space." Dorland's Illustrated Medical Dictionary 1698 (29th ed. 2000).

4

At another follow-up appointment on October 28, 2008, Thompson complained of continued pain in his left shoulder and numbness in his left hand. (R. 244-45). Dr. Min noted that Thompson continued to report "fairly severe pains" from his left shoulder down his arm. (R. 244). Thompson additionally reported that he had numbness in his left leg and foot. *Id*. Dr. Min observed that Thompson ambulated without difficulty but with a mildly spastic gait. *Id*. He noted that Thompson had good strength in his arms and legs, though he found weakness in Thompson's left deltoid and biceps. *Id*. Thompson was given a refill prescription for Lortab. *Id*. Dr. Min noted a diagnosis of cervical spondylosis[3] and wrote "I have told him that I am not sure if there is anything else that can be done for him. However, I have recommended that he undergo another MRI scan to check to se[e] if there are any residual areas of stenosis or cord compression that could possibly be addressed." *Id*. Dr. Min noted that Thompson was to have a follow-up appointment after the MRI. *Id*.

On November 12, 2008, Thompson called Dr. Win's office and declined the MRI and stated he would call back when he could afford it. (R. 243).

One year later, on November 3, 2009, Thompson presented to the emergency room at Hillcrest Medical Center for lower back pain. (R. 263-71). Thompson's lower back pain was reportedly of a sudden onset, beginning one week earlier and had gradually worsened. (R. 265). He reported that he had tingling in his left lower extremity. *Id*. However, upon examination,

---

[3] Cervical spondylosis is a "degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating down the arms as a result of pressure on the nerve roots." Dorland's at 1684.

Thompson evidenced no numbness or dysesthesia[4] and responded appropriately to touch. *Id*. His reflexes were normal and he had normal extremities with adequate strength and a full range of motion. *Id*. The only noted abnormality was that Thompson walked with an antalgic gait. *Id*. Thompson was diagnosed with lumbosacral sprain/strain, chronic neck pain, and moderate elevation of blood pressure. (R. 266). He was treated with an injection of Toradol and given prescriptions for Lortab, Motrin, and Norflex. (R. 266, 269-70). It was written that Thompson was excused from work on November 3, 2009 through November 4, 2009, and upon returning to work, would have 7 days of limitations, including no repetitive bending, twisting, or stooping, no bending forward/backward past 30 degrees, and he could not lift more than 15 pounds. (R. 270-71).

Agency consultant Joel Justin Hopper, D.O., conducted an examination of Thompson on April 23, 2009. (R. 248-53). Thompson told Dr. Hopper that he had quit working in 2007 because he had numbness in his hands and difficulty maintaining a sustained grip. (R. 248). He reported that his left side was more affected than his right. *Id.* Thompson reported he experienced pain turning his head. *Id.* During the examination, Dr. Hopper observed that Thompson walked about the exam room easily and ambulated with a stable gait and at an appropriate speed. (R. 249-50). Dr. Hopper wrote that Thompson moved all his extremities well and that Thompson had normal toe/heel walking. *Id.* Dr. Hopper found Thompson's finger to thumb opposition was adequate and he had normal fine tactile manipulation of objects. (R. 249, 252). Dr. Hopper's examination showed that Thompson demonstrated a reduced range of motion in his cervical spine, with 20/60 neck extension and 45/60 neck flexion. (R. 250). Other than

---

[4] Dysesthesia is the "distortion of any sense, especially that of touch." Dorland's at 553.

those two limitations, Thompson otherwise had a normal range of motion. *Id*.

Dr. Hopper's assessment of Thompson was:

1) C4 fracture with central canal syndrome, status post C3-C6 laminectomy (2008)
2) Bilateral upper extremity paresthesias - secondary to #1
3) Chronic lumbar pain secondary to bulging lumbar disc

(R. 249).

Nonexamining agency consultant Thurma Fiegel, M.D., completed a Physical Residual Functional Capacity Assessment on May 4, 2009. (R. 254-61). Dr. Fiegel indicated that Thompson could lift and carry 20 pounds occasionally and 10 pounds frequently. (R. 255). She determined that he had no pushing or pulling limitation. *Id*. She found that Thompson could stand, walk, or sit for 6 hours in an 8-hour workday. *Id*. In the portion of the form calling for narrative explanation of these findings, Dr. Fiegel summarized Thompson's medical records and the findings of Dr. Hopper's consultative examination. (R. 255-56). For postural limitations, Dr. Fiegel indicated that Thompson could occasionally balance, and climb stairs and ramps, but he could never climb a ladder, rope, or scaffolds. (R. 256). She additionally indicated that Thompson could frequently stoop, kneel, crouch, or crawl. *Id.* She found that Thompson would not have any manipulative limitations. (R. 257).

On August 14, 2009, after reviewing all of the medical evidence, nonexamining agency consultant Luther Woodcock, M.D., affirmed Dr. Fiegel's assessment. (R. 262).

**Procedural History**

Thompson filed applications on September 23, 2008 for disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R. 110-15). Thompson alleged onset of disability as January 1, 2007. (R. 110, 113). The applications

were denied initially on May 4, 2009, and on reconsideration on August 19, 2009. (R. 55-58). A hearing before Administrative Law Judge Deborah L. Rose was held April 14, 2010 in Tulsa, Oklahoma. (R. 22-54). By decision dated May 21, 2010, the ALJ found that Thompson was not disabled. (R. 8-18). On January 14, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education,

steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.* (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ made her decision at Step Five of the evaluation process. At Step One, the ALJ found that Thompson had not engaged in substantial gainful activity since his application date of August 8, 2008. (R. 13). At Step Two, the ALJ found Thompson's degenerative disk disease and status post-cervical spine injury and surgery were severe impairments. *Id*. At Step Three, the ALJ found that Thompson's impairments, or combination of impairments, did not meet any

---

work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Listing. *Id*.

After reviewing the record, the ALJ determined Thompson had the RFC to perform less than the full range of light work, with limitations of lifting/carrying or pushing/pulling 20 pounds occasionally and 10 pounds frequently, standing/walking/sitting for 6 hours in an 8-hour workday, occasionally balance and climb stairs and ramps, and never climb ladders, ropes or scaffolds. (R. 13-14). At Step Four, the ALJ found that Thompson was not capable of performing past relevant work. (R. 16). At Step Five, the ALJ found that there were jobs in significant numbers in the economy that Thompson could perform, taking into account his age, education, work experience, and RFC. (R. 17). Therefore, the ALJ found that Holden was not disabled from August 8, 2008 through the date of her decision. (R. 17-18).

**Review**

Thompson asserts the ALJ erred in failing to fully develop the record and in her RFC determination. Because the undersigned finds that the ALJ's decision is supported by substantial evidence and satisfies legal requirements, the ALJ's decision is affirmed.

**Development of the Record**

Thompson initially argued that Dr. Hopper's consultative examination did not fulfill the ALJ's duty to develop the record and could not serve as support of the ALJ's decision because Dr. Hopper was not a "qualified medical source" pursuant to 20 C.F.R. § 416.919g. Plaintiff's Opening Brief, Dkt. # 16, pp. 4-5. This argument was based upon an internet search that led Thompson to believe that Dr. Hopper was not licensed in the state of Oklahoma. As represented by the Commissioner, and confirmed by this Court by telephone on May 31, 2012 with the Oklahoma State Board of Osteopathic Examiners, Dr. Hopper was in fact licensed in Oklahoma

from December 20, 2007 through June 30, 2009. *See* Defendant's Response, Dkt. # 17, p. 4. This argument is therefore moot. In his Reply Brief, Thompson still urged that Dr. Hopper was not qualified because he did not have the requisite "training and experience" pursuant to 20 C.F.R. § 416.919g(b). Plaintiff's Reply Brief, Dkt. # 18, p. 1. Again, Thompson based this argument on information found online with the Virginia Board of Medicine, where Dr. Hopper has been licensed since April 19, 2009. Thompson argues that because the website indicates "0" years of "active clinical practice," Dr. Hopper did not have the necessary experience to be considered a qualified medical source. *Id.*

The Regulations require a "qualified medical source" be currently licensed and have training and experience required to perform the type of examination ordered by the ALJ. 20 C.F.R. § 416.919g(b). There is no requirement that a medical source have a particular type or quantity of training or experience. Other than the notation found online, Thompson has offered no evidence that Dr. Hopper was not a "qualified medical source" to perform a basic consultative examination. Thompson has presented no evidence regarding the accuracy of the online information, nor is there evidence regarding how the Virginia Board defines "active clinical practice." Clearly, Dr. Hopper has *some* history of clinical practice as he has provided multiple consultative examinations for the Commissioner. The undersigned finds there is insufficient evidence that Dr. Hopper, the licensed physician who performed the general consultative examination ordered by the ALJ, did not constitute a "qualified medical source."

Thompson also argues that the ALJ failed to fulfill her duty to develop the record in that she failed to obtain an MRI scan of Thompson's spine. An ALJ "has a basic duty of inquiry to fully and fairly develop the record as to material issues." *Baca v. Dept. of Health & Human*

*Servs*., 5 F.3d 476, 479-80 (10th Cir. 1993). However, the ALJ has "broad latitude" in ordering consultative examinations and "does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment." *Hawkins v. Chater*, 113 F.3d 1162, 1166-67 (10th Cir. 1997). Furthermore, the ALJ is entitled to rely on a claimant's counsel to present and structure the case in such a way as to adequately explore all claims. *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009); *Hawkins*, 113 F.3d at 1168.

Thompson did, in fact, receive a consultative examination by Dr. Hopper prior to the hearing before the ALJ. (R. 248-53). Thompson was represented by counsel at the hearing and Thompson's counsel did not suggest that an MRI, or any other additional testing, be conducted. When a claimant is represented by counsel, the ALJ can ordinarily rely on counsel to structure and present the claimant's case. *Hawkins*, 113 F.3d at 1166-67. The *only* statement counsel did make was that Thompson's "inability to see a neurosurgeon or a neurologist to get this followed up has *kind of* hampered on the development of records." (R. 26) (emphasis added). This vague, weak, and inconclusive statement can not be deemed as a request for the ALJ to further develop the record by ordering an MRI. *Hawkins*, 113 F.3d at 1168 ("In the absence of such a request by counsel, we will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record."). Thompson testified that his doctor told him he "*might* need another MRI to see if he need[ed] to go through further surgery but that [he] didn't have the money." (R. 38) (emphasis added). Again, this inconclusive comment was not made in the context of asking the ALJ to order an MRI or other testing.

Furthermore, the ALJ asked Thompson's counsel if there was anything else that needed to

12

be addressed, to which counsel replied, "No, Your Honor. *I believe the case is submitted.*" (R. 54) (emphasis added). Counsel did not indicate the record was incomplete or needed to be developed further. Indeed, counsel specifically stated that the case was ready to be submitted to the ALJ. As set forth by the Tenth Circuit,

> Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record - indeed, to exhort the ALJ that the case is ready for decision - and later fault the ALJ for not performing a more exhaustive investigation. To do so would contravene the principle that the ALJ is not required to act as the claimant's advocate in order to meet his duty to develop the record. . . . *In short, we will not ordinarily reverse or remand for failure to develop the record when a claimant is represented by counsel who affirmatively submits to the ALJ that the record is complete*.

*Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008) (emphasis added). Given the "broad latitude" of the ALJ in ordering consultative examinations, counsel's affirmative assertion that the case was ready for decision, and counsel's failure to request an MRI and failure to point out the significance of obtaining an MRI, the undersigned finds no error in the ALJ's duty to develop the record and failure to order an MRI. *Id.*; *Hawkins*, 113 F.3d at 1166.

**Step Three and Listing 1.04A**[6]

At the hearing before the ALJ, Thompson's counsel also stated that it was his "theory" that the case should be decided at Step Five. (R. 26-27). Now, for the first time on appeal, Thompson argues that an MRI likely would have revealed the severity of an impairment fulfilling all the criteria of Listing 1.04A and that a finding of disability could have been determined at Step Three. Plaintiff's Opening Brief, Dkt # 16, p. 7. Listing 1.04A requires a disorder of the spine

---

[6] Thompson did not have a separate Step Three argument, but had incorporated it into his argument regarding development of the record. However, the undersigned finds it is more appropriately addressed separately.

resulting in compromise of a nerve root with:

> [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A. Thompson urges an MRI could show evidence of nerve root compression, one of the criteria.[7] However, *all* of the conditions must be present before Thompson would meet the Listing at Step Three. *Id*.

The undersigned finds that substantial evidence supports the ALJ's finding that Thompson's condition did not meet Listing 1.04A, even if an MRI would have revealed nerve root compression. For example, in April 2009, Dr. Hopper noted Thompson was able to easily ambulate with a stable gate at an appropriate speed, had negative straight leg raises, had normal heel/toe walking, normal reflexes, normal strength, and normal tactile manipulation. (R. 15, 249-50). Dr. Hopper also noted that although Thompson had a limited range of motion in his cervical spine, Thompson did not experience any neck pain during the examination and had no tenderness or muscle spasms. *Id*. While this examination did reflect limited range of motion of the spine on that one date, the undersigned finds that this one piece of evidence does not rise to the level of evidence showing that Thompson had neuro-anatomic distribution of pain, motor loss, as shown by muscle weakness, or accompanied by sensory or reflex loss. Similarly, several months later,

---

[7] Thompson also argued an examination by a qualified medical source would likely provide evidence showing he met the remaining criteria. Plaintiff's Opening Brief, Dkt. # 16, p. 7. However, as discussed above, Thompson did receive an examination by Dr. Hopper, a qualified medical source, whose examination did not show evidence of the remaining criteria. (R. 248-53).

in September 2009, Thompson's medical records indicate he had a normal sensory exam with normal reflexes and no numbness or dysesthesia. (R. 265). At that time, Thompson also demonstrated a full range of motion, and had normal extremities with adequate strength, no weakness, and normal reflexes. *Id*. Therefore, on those dates in April and September 2009, Thompson did not have the required findings that would support a conclusion that he met all of the requirements of Listing 1.04A, even if an MRI showed evidence of nerve root compression. These records constitute substantial evidence supporting the ALJ's finding.

Thompson points to two pieces of evidence in support of his argument that he meets Listing 1.04A: 1) in October 2008, one month after his surgery, Thompson experienced weakness in his left arm; and 2) Dr. Hopper's findings from April 2009 indicate Thompson had a decreased range of motion in his cervical spine. (R. 244, 250). These two entries, spaced several months apart, do not demonstrate that Thompson's condition met Listing 1.04A. There is no evidence in the record that would show Thompson met all of the requirements of Listing 1.04A on any one date. In fact, the most recent medical records indicated Thompson had no weakness, normal reflexes, adequate strength and demonstrated a full range of motion. (R. 265). Even if an MRI had been ordered and did show evidence of nerve root compression, there is no medical evidence demonstrating that the remaining and necessary factors of the Listing could be met. Therefore, the ALJ's Step Three finding was supported by substantial evidence.

**RFC Determination**

The ALJ found that Thompson had the RFC to perform less than a full range of light work, with limitations of being able to lift/carry or push/pull 20 pounds occasionally and 10 pounds frequently, the ability to stand and/or walk for six hours, sit for six hours, and could

occasionally balance and climb stairs and ramps, but could never climb ladders, ropes, or scaffolds. (R. 13-14). This RFC is consistent with and supported by the assessment completed by Dr. Fiegel, which was confirmed by Dr. Woodcock, and which was based, in part, on Dr. Hopper's evaluation and records from Dr. Min. (R. 16, 254-62).

Thompson's sole argument regarding the ALJ's error in the RFC determination is, once again, based on his assumption that Dr. Hopper was unqualified to perform a consultative exam, and therefore it was improper for the non-examining agency consultants to rely on Dr. Hopper's report and those opinions could therefore not constitute substantial evidence. Plaintiff's Opening Brief, Dkt. #16, p. 8. As discussed above, the undersigned finds Dr. Hopper is a qualified medical source, and therefore his opinion, and the opinions formed by the non-examining agency consultants are substantial evidence supporting the ALJ's determination of Thompson's RFC.

**Conclusion**

Based upon the foregoing, the Court **AFFIRMS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 5th day of July, 2012.

_____
Paul J. Cleary
United States Magistrate Judge